Wallace M. WHEELER, Jr., Petitioner,

v.

John N. REYNOLDS, Respondent.

No. 941.

United States District Court
N. D. Florida,
Pensacola Division.

July 14, 1958.

F. B. Estergren, Ft. Walton Beach, Fla., for petitioner.

Wilfred C. Varn, U. S. Atty., Tallahassee, Fla., William M. Burch, II, Major, USAF, Office of the Judge Advocate General U. S. Air Force, Washington, D. C., for respondent.

DE VANE, District Judge.

The basic question raised in this case is whether, after release from active duty in the Air Force to a reserve status, a member of the United States Air Force Reserve, who has an uncompleted military service obligation, is subject to Article 3(a) of the Uniform Code of Military Justice, 10 U.S.C. § 803(a), for the purpose of trial by court-martial on a charge of premeditated murder of a woman in Germany, committed allegedly by the petitioner while on such active duty and prior to his release therefrom. The power of this Court extends to but is limited to such question. United States v. Grimley, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636.

The issue arises by a return and answer to an order to show cause, granted in response to a petition for a writ of habeas corpus filed by the petitioner, who is held in military custody at the base stockade, Eglin Air Force Base, Florida, against John N. Reynolds, Colonel, United States Air Force, the Base Commander.

The evidence adduced on behalf of the petitioner and the respondent consists of numerous documents, affidavits, statements, orders, reports, and regulations, all stipulated to be received and so considered by the Court. From such evidence the following relevant and pertinent facts appear:

The petitioner, Wallace M. Wheeler, Jr., then eighteen years of age, enlisted in the United States Air Force for four years on June 4, 1954. He was transferred to Germany in early May, 1955 and served there in two commands, one at Ramstein and one at Weisbaden, until late October, 1957. For reasons not appearing from the evidence, he was ordered returned to the United States about October 18, 1957. While en route

from his last duty station at Ramstein to Rhein Main Air Base, the place from which he was to be transported back to the United States, he spent October 18, 19, 20, and a part of October 21 at Weisbaden. There he encountered a woman whom he had met while stationed there in 1955. It is this woman whom he is charged with having murdered on October 20, 1957. Although their voluntary character is disputed by the petitioner, in accordance with two sworn statements, signed by him, one reduced to narrative form and given to a member of the Pensacola Florida Police Department, and one in question and answer form, elicited by a Special Agent of the Office of Special Investigations, United States Air Force, petitioner confessed to the slaying of the woman. In each instance, prior to his interrogation and the execution of such statement or the giving of the answers, he was advised of his right against self-incrimination.

Subsequent to October 21, 1957 petitioner arrived in the United States, and pursuant to certain military orders dated October 26, 1957, he was relieved from active duty with the Air Force and was transferred, in his then grade of Airman Third Class, to a reserve status, under command of the Headquarters Continental Air Command, Air Reserve Records Center, Denver Colorado, for completion of his military service obligation under the Universal Military Training Act, 50 U.S.C.A. Appendix, § 451 et seq.

Thereafter, petitioner engaged in civilian employment in Washington, D. C.

On March 18 and 19, 1958, while on a visit to the home of his parents at Pensacola, Florida, petitioner was contacted telephonically by an agent of the Office of Special Investigations, Eglin Air Force Base, Florida, approximately fifty miles east of Pensacola, relative to an interview as to an undisclosed subject, and he volunteered to call at such office. On March 20th, while enroute to such office, he had car trouble but, after telephonically advising such office of his location, was met and taken there. There he was questioned concerning the alleged homicide and his activities prior to, at the time of, and subsequent to its commission. As a result of this interrogation he signed and swore to a narrative form statement, wherein he admitted intimate relations with the deceased prior to her death and admitted discovering her dead body after a five hour absence from her apartment, but denied committing the crime. Although petitioner contends that he was restrained from leaving during such interrogation, this is denied by the agents and does not appear well founded in fact.

Later the same day, petitioner was returned to the home of his parents in Pensacola by transportation furnished by the agents and petitioner agreed to submit to a lie detector test on the day following.

On March 21 he met an Air Force agent and was conducted to the Pensacola Florida Police Department and to one Walter R. Steinsiek, Jr., polygraph examiner of such department. Although the petitioner consented voluntarily and in writing to submit to such test to be given him by Mr. Steinsiek, it was not, in fact, given.

As the result of certain pre-test questioning of the petitioner by Steinsiek, petitioner confessed verbally to killing the woman in Weisbaden and, after the facts related by petitioner were taken down by Steinsiek, a typed, narrative form statement thereasto, with occasional errors or misprints therein noted and initialed by petitioner, was prepared by Steinsiek. Immediately thereafter, in the presence of certain police department employees, not present during petitioner's questioning, the statement was read to and by the petitioner and he signed and swore to its truth. Again, prior to his being questioned and prior to his signing the statement, he was advised as to his right against self-incrimination.

In the interview on March 20th with the Air Force agents and in his interview with Steinsiek on March 21st, the matter of the likelihood of petitioner's extradition to Germany to stand trial by

the German civilian courts for the murder of the woman was introduced by petitioner and discussed with the agents, Steinsiek, and with an Air Force officer. In his conversations with the Air Force agents and with Steinsiek and later the officer, petitioner expressed concern about being returned to Germany to stand trial by the German courts and stated his preference strongly to be tried by Air Force court-martial, expressing further, the desire to be returned to an active duty status for such purpose, if possible. The agents and Steinsiek disclaimed any knowledge of whether he could be recalled to active duty. His desire to be recalled to active duty and to plead guilty to any charge which the Air Force might charge him with rather than to go back to Germany and stand trial in the German courts was included in the concluding paragraph of the signed statement given to Steinsiek on March 21st.

Following the execution of this statement, Steinsiek advised petitioner that he would have to detain him in view of his confession of murder, pending decision as to his disposition. Steinsiek thereupon charged him with and he was detained by the Pensacola Police Department for vagrancy and investigation of murder.

On March 25th, while still in custody, in answer to the question of an Air Force agent, petitioner re-expressed the desire to return to active duty with the Air Force. Upon further interrogation by another agent, transcribed, sworn to, and signed by petitioner after further preliminary warning against self-incrimination, he re-confessed to the homicide and re-expressed a desire to return to active duty with the Air Force for mixed reasons of improved personal comfort and fear of possible extradition to Germany.

On March 26, 1958, by a memorandum-directive to the Eglin Air Force Base commander and the Air Provost Marshal, Secretary of the Department of the Air Force, James H. Douglas, advised of having read and considered petitioner's con-

fession to the homicide and expressed the opinion that he could not be tried by any courts of the United States, or of a state, territory, or District of Columbia; and that, despite his release from active duty, petitioner remained subject to court-martial jurisdiction as to such homicide, pursuant to the provisions of Article 3(a), Uniform Code of Military Justice. He consented to and directed petitioner's apprehension, return to military control at Eglin Air Force Base, Florida, for further investigation, and trial by court-martial thereafter, if appropriate.

On March 26th, while still in the Pensacola jail, petitioner executed a form-application for extended active duty with the Air Force, after the officer who presented the same to him for signature, told him to read a statement therein to the effect that, upon his recall to active duty, he would be confronted immediately with court-martial charges, and explained such statement to him also. According to this officer, petitioner's desire to execute such application was so great that the officer restrained him from signing it until he was assured that petitioner was doing so entirely voluntarily.

Upon receiving telephonic approval of petitioner's application for recall to active duty from the Eglin Air Force Base, this officer, accompanied by petitioner, proceeded to the base, where, upon arrival, petitioner was confined to the stockade.

On March 28th formal court-martial charges, charging petitioner with the pre-meditated murder of Felicitis Georg on October 20, 1957, at Weisbaden, Germany, in violation of Article 118 of the Uniform Code of Military Justice, 10 U.S.C. § 918, were preferred against petitioner, who was advised thereasto on the same date.

By order dated March 26, 1958 of the Air Force headquarters at Denver, Colorado, to which petitioner had been assigned by his earlier orders of October 26, 1957, he was relieved of his then assignment to such headquarters as a re-

servist, and was assigned on active duty to the Headquarters, Air Proving Ground Command, Eglin Air Force Base, Florida.

On April 3rd petitioner was paid, by way of a clothing issue, $219.40 and on April 21st he received $52 in pay to which he was entitled in his grade of Airman Third Class for the period of March 26th to April 15th, 1958. On April 3rd, he had received also partial pay of $10.

On April 11th, pursuant to an investigation of the charge against petitioner, as required by Article 32 of the Code of Military Justice, 10 U.S.C. § 832, the investigating officer recommended his trial by a general court-martial.

On April 14th the petition herein was filed on behalf of the petitioner.

In and by such petition, petitioner contends that his present military confinement is without legal authority because of his release from active duty and being placed in a reserve status on October 26, 1957; and further, because his consent to be recalled to active duty was involuntary and void, and further, because Air Force regulations do not authorize the recall to active duty of reservists for the purpose of trial by court-martial.

The Air Force is one of the armed forces of the United States and the Air Force Reserve is its reserve component or a constituent part of the Air Force. 10 U.S.C. §§ 101, 261(a).

Since petitioner became a member of the Air Force by enlistment at age eighteen on June 4, 1954, in accordance with the Military Training and Service Act, he was, to quote the language of the applicable section, required "to serve in the armed forces" for a total of eight years, unless sooner discharged because of personal hardship. 10 U.S.C. § 651(a). Consequently, at the time of his release from active duty on October 26, 1957, having served three years, four months, and three days, his statutory military service obligation required him to "serve in the armed forces" until June 3, 1962.

It is not contended by petitioner that he was discharged because of hardship, or that he was previously a reservist, or that he was disqualified from performing his remaining military service obligation at the time of his release from active duty. 10 U.S.C. § 651(a)(b). In accordance with Section 651(b), upon his release from active duty, the Air Force was required to and did transfer petitioner to its reserve component, the Air Force Reserve, for completion of the service of his eight year military obligation.

Title 10 U.S.C. § 267, creates as to each armed force, within its reserve component, a Ready Reserve, a Standby Reserve, and a Retired Reserve. Such section has been implemented by Air Force Regulation 45–1, inter alia, pertaining to the Mission, Composition, and Program Elements of Reserve Components. Further, by par. 2a, Air Force Regulation 39–63, the requirements imposed by 10 U.S.C. § 651 are implemented and effectuated by the requirement that airmen released from active duty, who have a reserve obligation, will not be discharged; will be transferred to the Air Force Reserve for completion of their service obligation, and, unless accepted for assignment in a Ready Reserve unit or a mobilization position, will be assigned to the Ineligible Reserve Section, Continental Air Command, Air Force Reserve Center, Denver, Colorado. Petitioner was so assigned. Further, by Air Force Regulation 45–14, only those Ready Reservists, assigned to ready mobilization program elements are eligible for tours of active duty or active duty for training. It is not contended that petitioner was so assigned or was so eligible.

The purpose of the armed forces reserve components is primarily to provide qualified, trained persons available for speedy call to active duty in time of war, national emergency, and at such other times as the national security requires. 10 U.S.C. § 262. While it is true that, both by voluntary enlistment and con-

scription, the government has, in the past, and can, in the future, in event of war or national emergency, obtain the necessary men and women, who, after training and equipping, will be the soldiers, sailors, and airmen, to provide adequately for the defense of this nation, yet, the procedures for their procurement, their physical and mental examinations and other processing, and the requirements as to their basic and further training, differ greatly from the more summary procedures established by Congress in the operation of the reserve components for recalling to active duty, qualified, available, trained, and obligated reserve personnel.

Further, while the different categories of the Air Force Reserve are charged with varying requirements as to active duty and inactive duty training, and vary as to eligibility for pay, promotion, and other military desirable advantages accruing to reservists, such differences do not affect the basic status of all reservists as constituting continuing members of the reserve component of the Air Force and, hence, of the Air Force, and their continuing military obligation to respond to active duty orders when war or national emergency or other lawful contingency may require. It is true that for non-military purposes and for purpose of receiving various veteran's benefits, petitioner occupies the same relationship to the government respectively, as do other citizens who have had no military connection or as to discharged veterans who have had such relations but who have no further statutory military obligations, present or prospective. Nonetheless, by reason of his military obligation and reserve status, however inactive or limited it may be, for the military purposes intended by Congress to be served by the creation and maintenance of the present reserve components of the armed forces, petitioner, when released from active duty, was not a full-fledged civilian, nor in the same status as a discharged veteran, but was an Airman Third Class of the Air Force Reserve.

Article 3(a), Uniform Code of Military Justice, 10 U.S.C. § 803(a), provides in pertinent part that:

" * * * No person charged with having committed, while in a status in which he was subject to this chapter, an offense against this chapter, punishable by confinement for five years or more and for which the person cannot be tried in the courts of the United States or of a State, a Territory, or the District of Columbia, may be relieved from amenability to trial by court-martial by reason of the termination of that status."

Petitioner is charged with the crime of premeditated murder of a woman in Germany on October 20, 1957, while he was an Airman Third Class on active duty in the Air Force, in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918.

That at such time and place he was subject to such Code, in accordance with Article 2 thereof, 10 U.S.C. § 802, is unquestioned. Had petitioner remained on active duty to the present time, such jurisdiction would have continued. Article 2(1).

Premeditated murder under Article 118 is punishable by death or life imprisonment.

Article 2(1, 3) of the Code, 10 U.S.C. § 802, declares that as far as reserve personnel are concerned, only those on active duty or those on inactive duty training who have voluntarily accepted written orders which specify them to be subject to the Code, are so subject.

Prior to the Act of May 5, 1950, when the present Uniform Code of Military Justice, applicable to all of the armed forces, was enacted, Article 3(a) had not been enacted.

That a member of the reserve component of the armed forces on inactive duty, after the end of such member's terminal leave, was not amenable to court-martial jurisdiction for an offense allegedly committed by such member

prior to the inception of such inactive duty status, appears clear from the decision in Hironimus v. Durant, 4 Cir., 168 F.2d 288 and the cases and other authorities cited thereunder.

Unless the provisions of Article 3 of the Code, 10 U.S.C. § 803, extend to a member of a reserve component on inactive duty, no court-martial jurisdiction exists to try him for any offense committed during a prior active duty status.

However, such Article declares expressly amenable to trial by court-martial and hence, to court-martial jurisdiction, for only the serious offenses referred to, those persons who were subject to the Code at the time of the commission of the crimes, although their status at the time of trial by court-martial has become such that they are no longer subject to the Code except for those provisions.

■ This Court is of the opinion that petitioner's status at the time of his confinement to the Eglin Air Force Base stockade falls within the category last above mentioned.

Petitioner urges, however, that because of the termination of his active duty status on October 26, 1957, it became the same as though he had been discharged from the Air Force completely and that, therefore, his case is controlled by the decision in United States ex rel. Toth v. Quarles, 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8, wherein the Supreme Court held Article 3(a) of the Code to be unconstitutional in so far as it was sought to be applied to Toth, a former member on active duty of the Air Force, who, prior to his arrest and return to military control for murder in Korea, had been discharged completely from the Air Force. The language of the Court particularized his status as being one "with no further relationship of any kind with the military." Despite the language in U. S. v. Gallagher, 21 C.M.A. 435 and in the note in Lee v. Madigan, 9 Cir., 248 F.2d 783, 786, it is to be noted that the decision of unconstitutionality did not purport expressly to extend to the act itself, but merely to its application to Toth as a discharged veteran.

In the Toth case, the Court re-stated the principle that Sub-section 14, Section 8, Article I of the Constitution, relative to the power of the Congress "To make Rules for the Government and Regulation of the land and naval Forces", as "supplemented by the Necessary and Proper Clause" [350 U.S. 11, 76 S.Ct. 4], and re-affirmed that such Article "authorizes Congress to subject persons actually in the armed service to trial by court-martial for military and naval offenses." That Congress deemed reservists to be "in the armed forces" appears from the various provisions of the law relative to the composition of the reserve components and the provisions of Article 2(1, 3) of the Code, 10 U.S.C. § 802(1, 3). In Billings v. Truesdell, 321 U.S. 542, 64 S.Ct. 737, 88 L.Ed. 917, the Supreme Court held a draftee to be subject to court-martial jurisdiction before his actual induction into the armed forces.

By analogy, were a reservist, obligated to service and obligated to respond to a call to active duty in time of war or national emergency, as prescribed by 10 U.S.C. § 672, to fail to so respond, logic would dictate that, for such failure, he would be amenable to court-martial jurisdiction for such dereliction as to his military, as distinguished from his civilian duty.

That a great difference exists between discharge from an armed force, as particularized by the Supreme Court in the Toth case, and mere release from active duty and contemporaneous transfer to and assignment in a reserve component, is clear. Such distinction appears from their definitions in Air Force Regulation 39–63, which, although not controlling, are apt. Paragraphs 1a and b of such regulation provide:

> "a. Release from Active Duty.— the termination of active military service and transfer to the Air Force Reserve."

"b. Discharge.—complete severance from all military status, as upon expiration of enlistment when the air man does not have any reserve or service obligation, or under regulations which specifically require complete severance from the service prior to expiration of enlistment, and/or prior to fulfillment of obligation. Discharge includes termination of any reserve status."

■ Toth was discharged, but petitioner was not discharged. Hence, the Toth case is not deemed controlling of this case.

In the consolidated cases of Reid v. Covert (Kinsella v. Krueger), 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148, the Supreme Court held that Congress could not constitutionally provide for trial by court-martial of civilian dependents accompanying military personnel overseas. In each case, a civilian wife was charged and convicted by court-martial of murdering her service man husband.

As stated in Lee v. Madigan, 9 Cir., 248 F.2d 783, 786, "the common denominator of all three decisions, as well as the basis for them, is that the defendant in each case was a civilian with absolutely no present relationship to the military. They were all full-fledged civilians when they were tried. * * * The Supreme Court regarded trial by military authorities of such persons as inimical to fundamental Constitutional safeguards guaranteed civilians."

The memorandum order of the Secretary of the Air Force, dated March 26, 1958, giving consent to and directing the Air Provost Marshal to apprehend and deliver petitioner to the Commander, Eglin Air Force Base, Florida, for purpose of further investigation and trial by court-martial, if thereafter deemed appropriate, is based upon the ground that because of the petitioner's reserve status and unfulfilled military obligation, jurisdiction of him under Article 3(a) of the Uniform Code of Military Justice has not terminated. This court concurs therewith.

In view of the court's conclusions, as stated above, with respect to the petitioner's claim of lack of jurisdiction over him by the military authorities by reason of his release from active duty and transfer and assignment to the Air Force Reserve, it is unnecessary to determine whether such jurisdiction exists likewise for the further reasons contended by the respondent.

Accordingly, the instant petition for writ of habeas corpus must be dismissed, the order to show cause discharged and it will be so ordered.

With regard to petitioner's plea for an order to retain petitioner within the United States following the dismissal of the instant petition and the discharge of the order to show cause, the present record in the case fails to show good cause therefor. But respondent will be expected to hold petitioner within the jurisdiction of this court until sufficient time has elapsed for petitioner to perfect an appeal from the final judgment of this court if he is so advised and desires to do so.