**Wendy L. WICKHAM,
Plaintiff-Appellant,**

v.

**Alvin O. HALL, Colonel, U.S. Army, and
United States, Defendants-Appellees.**

No. 82–1084.

United States Court of Appeals,
Fifth Circuit.

June 10, 1983.

Rehearing and Rehearing En Banc
Denied July 26, 1983.

Thornberry, Circuit Judge, filed dissenting opinion.

---

**714**

Stewart J. Alexander, San Antonio, Tex., for plaintiff-appellant.

Hugh P. Shovlin, Gordon D. Laws, Asst. U.S. Attys., San Antonio, Tex., for defendants-appellees.

Before CLARK, Chief Judge, THORN-BERRY and POLITZ, Circuit Judges.

CLARK, Chief Judge:

Wendy Wickham was discharged from active duty in the United States Army. Subsequently, her discharge was revoked on a claim that it had been gotten fraudulently. When court-martial proceedings were commenced against her, she claimed that Article 3(b) of the Uniform Code of Military Justice,[1] the statute under which the court-martial court asserted jurisdiction, is unconstitutional. She appeals from the district court's grant of summary judgment to the United States Army. Finding the statute to withstand constitutional scrutiny, we affirm.

In late August, 1980, Wickham submitted a urine sample as part of a pregnancy test. The test results indicated that she was approximately seven weeks pregnant. On October 15, 1980 she was found eligible for a discharge from active duty based upon that finding. Since she had not completed her military service obligation, her discharge from active duty also resulted in her transfer to the Individual Ready Reserve. She was assigned to the Army Reserve Control Group with her military service obligation to run until April 9, 1984.

In early November, Army officials learned that Wickham was not pregnant and that she had submitted the urine of another servicewoman who she knew was pregnant. An investigation by agents of the Army Criminal Investigation Division resulted in sworn statements verifying this information.

The Army promptly lodged a formal charge against Wickham and on December

---

1. Article 3(b) is codified at 10 U.S.C. § 803(b). It reads:

   (b) Each person discharged from the armed forces who is later charged with having fraudulently obtained his discharge is, subject to section 843 of this title (article 43), subject to trial by court-martial on that charge and is after apprehension subject to this chapter while in the custody of the armed forces for that trial. Upon conviction of that charge he is subject to trial by court-martial for all offenses under this chapter committed before the fraudulent discharge.

   While Article 3(b) is the section that confers jurisdiction, the provision that makes the act

criminal is Article 83, 10 U.S.C. § 883. It reads:

   Any person who—

   (1) procures his own enlistment or appointment in the armed forces by knowingly false representation or deliberate concealment as to his qualifications for that enlistment or appointment and receives pay or allowances thereunder; or

   (2) procures his own separation from the armed forces by knowingly false representation or deliberate concealment as to his eligibility for that separation;

   shall be punished as a court-martial may direct.

19, 1980 revoked the order which discharged her from active duty. Court-martial proceedings were then commenced against Wickham for fraudulently obtaining a discharge. Before her trial could begin, Wickham filed a petition with the United States Court of Military Appeals seeking to block the court-martial and to restore her to civilian status. A stay of the proceeding was granted, but a split three-judge panel of that court later dissolved the stay. Wickham sought collateral relief through a district court petition seeking a permanent injunction against further prosecution in the military court. In addition, Wickham's complaint sought release from military custody, the dismissal of the court-martial charge and damages. From the district court's grant of the Army's motion for summary judgment, Wickham appeals.

The issue presented is whether Article 3(b) may constitutionally confer court-martial jurisdiction over a person who has received a discharge that is later challenged by the issuing service on the ground it was fraudulently procured.

■ The Government urges that we avoid the constitutional question raised here on the basis that Wickham failed to exhaust her administrative remedies. It is basic to military claims that the petitioner must exhaust her military remedies before seeking federal court intervention. *Schlesinger v. Councilman,* 420 U.S. 738, 758, 95 S.Ct. 1300, 1313, 43 L.Ed.2d 591 (1975); *Gusik v. Schilder,* 340 U.S. 128, 131–32, 71 S.Ct. 149, 151–152, 95 L.Ed. 146 (1950); *Von Hoffburg v. Alexander,* 615 F.2d 633, 637 (5th Cir. 1980). While the Government's court-martial tribunal has not yet heard this case on its merits, by her injunctive action challenging military jurisdiction, Wickham has exhausted her military remedies on the issue presented.

■ The Constitution, in article I, section 8, clause 14, empowers Congress "[t]o make Rules for the Government and Regulation of the land and naval Forces." Article I, section 8, clause 18, authorizes Congress "[t]o make all Laws which shall be necessary and proper" to execute all powers which the Constitution vests in the Congress. *Kinsella v. United States ex rel. Singleton,* 361 U.S. 234, 237, 80 S.Ct. 297, 298–299, 4 L.Ed.2d 268 (1960); *Reid v. Covert,* 354 U.S. 1, 19, 77 S.Ct. 1222, 1231, 1 L.Ed.2d 1148 (1957); *Dynes v. Hoover,* 61 U.S. (20 How.) 65, 15 L.Ed. 838 (1852). This is a limited grant of power to Congress to create exceptions to Article III courts. Trial by court-martial and the Uniform Code of Military Justice are manifestations of that congressional authority. *Kinsella,* 361 U.S. at 237, 80 S.Ct. at 298–299. In balancing the need to maintain discipline and order in the armed services and rights of citizens to be free of military obligations and control, the Supreme Court has held that congressional power to authorize trial by court-martial must be limited to "the least possible power adequate to the end proposed." *United States ex rel. Toth v. Quarles,* 350 U.S. 11, 23, 76 S.Ct. 1, 8, 100 L.Ed. 8 (1955) (quoting *Anderson v. Dunn,* 19 U.S. (6 Wheat.) 204, 230–31, 5 L.Ed. 242 (1821)).

Wickham contends that once she received her discharge from active duty, she became a civilian. Therefore, under the teachings of *Toth v. Quarles, supra,* Congress cannot authorize a military court to exert jurisdiction over her because of her nonmilitary status. Since Article 3(b) is the basis upon which the military has asserted jurisdiction to revoke her discharge and return her to active duty, she argues that this portion of the UCMJ is unconstitutional.

In *Toth,* the Supreme Court found that "[i]t has never been contended by this Court, however, that Article I military jurisdiction could be extended to civilian ex-soldiers who had severed all relationship with the military and its institutions." 350 U.S. at 14, 76 S.Ct. at 4. The Army had predicated court-martial jurisdiction over Toth on Article 3(a) which subjected servicemen and former servicemen to trial by court-martial for certain offenses committed while in the service. The Court held that Congress could not constitutionally confer upon a military court jurisdiction over an exserviceman, who at the time he was accused of crime had absolutely no

military connections. Wickham asserts Article 3(b) is facially unconstitutional since it also subjects "civilians" to the jurisdiction of the military courts.

In *Toth v. Quarles,* the Court identified three factors which control the extent of military court jurisdiction over discharged servicemen. All are met in the instance of Article 3(b).

The Court asked whether the trial of this defendant would further the " 'primary' function of the military to 'fight' or be ready to fight wars, rather than the 'incidental' purpose of maintaining discipline within the service." 350 U.S. at 17, 22–23, 76 S.Ct. at 5, 8–9. While the exercise of jurisdiction to deter fraud certainly has the effect of maintaining discipline, limiting the initial inquiry to fraud in procuring a discharge makes the power impact directly on the military's readiness to fight. Fraudulent separation, like desertion, places the power to thin the ranks of those ready for combat in the hands of the soldier not the service.

The Court next asked if the extension of military jurisdiction would "sweep under military jurisdiction a great number of persons not otherwise subject to military law." *Id.* at 19–20, 22–23, 76 S.Ct. at 6–7, 8–9. The reach of Article 3(b) in this respect is minimal. It only subjects to jurisdiction those who in the midst of a legal period of service fraudulently procure a discharge. *See Wickham v. Hall,* 12 M.J. 145, 151 (C.M. A.1981 Cook, J.).

Finally, the Court asked whether "the scope of the extension of court-martial jurisdiction [2] [is] limited to *the least possible power adequate to the end proposed.'* " 350 U.S. at 23, 76 S.Ct. at 8 (emphasis in original). Article 3(b) meets this requirement. It is a narrowly drawn jurisdictional statute designed to maintain order and discipline in the service. It only asserts power over those who seek fraudulently to terminate their lawful period of service. Finally, it

acts to preserve an active, full, prepared military fighting force. *Toth* does not condemn Article 3(b).

The enforcement of service obligations is critical for the continued orderly governance of America's land and naval forces. The choice to accomplish that end by authorizing the armed forces to try and punish those who seek to abbreviate their lawful active duty commitments is a constitutionally reasonable exercise of congressional authority. Such a power is akin to the unquestioned power vested in the military to try and punish deserters. Art. 85, UCMJ, 10 U.S.C. § 885.

The legislative history of Article 3(b) reveals that Congress was reacting to cases arising after World War II in which servicemen had fraudulently procured discharges. The former servicemen then used their fraudulently obtained discharges to block military court action. *See* Hearings on the Uniform Code of Military Justice before a House Subcommittee of the Committee on Armed Services, 81st Cong., 1st Sess. 885 (March 18, 1949) (Comments of Felix Larkin, Assistant General Counsel, Office of The Secretary of Defense). Recognizing the seriousness of the problem, Congress gave military tribunals the authority to deal with an offense that would strike at the very heart of the individual's military commitment.

◼ A cardinal tenet of military law is that a serviceman, upon enlisting, has changed his status. *In re Grimley,* 137 U.S. 147, 150, 11 S.Ct. 54, 34 L.Ed. 636 (1890). In *Grimley,* the Supreme Court stated that "the taking of the oath of allegiance is the pivotal fact which changes the status from that of a civilian to that of soldier." *Id.* at 156–57, 11 S.Ct. at 56. Once that civilian becomes a soldier, his status as a member of the armed forces can only be honorably terminated by a completion of the service obligation or a valid discharge. A soldier may not by fraud cut short his military

---

**2.** It should be noted that this is not a recent expansion of military court jurisdiction, but a doctrine which has persevered since at least the Civil War. 28 Op.Att'y Gen. 170 (1910); 16 Op.Att'y Gen. 349 (1879); 26 Comp.Gen. 40, 45 (1946); 23 Comp.Gen. 419, 420 (1943); 4

Comp.Gen. 773, 777–78 (1925). In 1917, it became part of the Manual for Courts-Martial for the Army. MCM 1917, par. 38(d); MCM 1928, par. 38(d); MCM 1949, par. 10. It was later enacted into the UCMJ.

status before his service obligation is complete.

The Ninth Circuit has stated that once a serviceman has enlisted, "he cannot withdraw unilaterally and become a civilian again. Enlistment is a contract; but it is a contract which changes the status .... of the civilian to soldier until released." *Wallace v. Chafee,* 451 F.2d 1374, 1378 (9th Cir.1971), *cert. denied,* 409 U.S. 933, 93 S.Ct. 242, 34 L.Ed.2d 188 (1972). That release or discharge is only effective if it is validly procured. It must be "due and legal, not fraudulent." Winthrop, Military Law & Precedents 89 n. 46 (2d ed. 1920).[3] The Court of Military Appeals agreed with this position. Judge Cook's majority opinion noted that "[s]eparation procured by fraudulent means is not a valid separation.... The servicemember may merge with the civilian populace, but the fraudulent character of his separation exists and it binds him to the military community." *Wickham v. Hall,* 12 M.J. 145, 150 (C.M.A.1981).

According to Wickham, this is the rub. Who should decide whether she fraudulently procured her discharge, a civil or a military court? She contends she is a civilian until her discharge is proven to be fraudulently procured. To allow the military court to assert jurisdiction over the claim that her discharge was fraudulently procured so that the military court can determine whether there was fraud in its procurement presumes she is still in the service. It is just as circular, however, to presume the discharge is valid and thereby confer upon a civil court jurisdiction to decide the issue of validity.[4]

Wickham's argument is appealing, but not persuasive. First, it presupposes that an unfair resolution of the issue awaits her before the military tribunal. Despite the extreme examples used by Justice Douglas in his scathing attack on "so-called military justice" in *O'Callahan v. Parker,* 395 U.S. 258, 266 n. 7, 89 S.Ct. 1683, 1687 n. 7, 23 L.Ed.2d 291 (1969), military courts are not Kafkaesque Star Chambers. They assume the same responsibility to protect a person's constitutional rights as state and federal courts. *Burns v. Wilson,* 346 U.S. 137, 142, 73 S.Ct. 1045, 1048–1049, 97 L.Ed. 1508 (1953). This court is "unwilling to presume ... that the military courts will not fully and fairly consider the claims by petitioner of the violation of his constitutional rights ...." *In re Kelly,* 401 F.2d 211, 213 (5th Cir.1968). Although grand jury presentment and trial by petit jury are not parts of the system, and there is no right to bail the accused in a court-martial does enjoy most of the same significant constitutional rights accorded a criminal defendant in a civil court.[5]

Whether Wickham's pregnancy test/discharge was validly or fraudulently procured depends in large part upon army regulations and procedures. Such matters fall within the special expertise of the military

---

**3.** Colonel Winthrop's book on military law is regarded as the leading authority on the area. He contends that "[w]hile an order for ... a discharge may be recalled before it is executed, the discharge once duly delivered cannot be cancelled or revoked except where obtained by falsehood or fraud." Winthrop, Military Law & Precedents 550 (2d ed. 1920).

**4.** The dissent questions whether our decision that the military court has jurisdiction is based upon an assumption of Wickham's guilt. This is not so. A trial will determine her innocence or guilt. The dissent's question confuses the function of the presumption of innocence in the conduct of a trial and the use of that presumption to decide the threshold question of jurisdiction.

A charge has been leveled against Wickham that she fraudulently procured her discharge. It is this charge that raises the jurisdictional

question we answer. Like a bill of information or a grand jury indictment in a civilian criminal case, the charge puts before the military court the duty to make a determination of innocence or guilt in a trial proceeding—a proceeding which the dissent concedes will accord Wickham the presumption of innocence. The question for this court should find its answer not in presumptions but in the application of *Toth's* factors.

**5.** The UCMJ prohibits coerced confessions (art. 31, 10 U.S.C. §.831), double jeopardy (art. 44, 10 U.S.C. § 844), and cruel or unusual punishments (art. 55, 10 U.S.C. § 855). It gives the accused the right to be apprised of the charges against him (art. 30(b), 10 U.S.C. § 830(b)), to be represented by counsel of his choice (art. 38, 10 U.S.C. § 838), and to compulsory process to obtain witnesses (art. 46, 10 U.S.C. § 846).

courts. *Schlesinger v. Councilman,* 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975). We should defer to them in these respects.

Second, the determination being made by the military court in this instance is precisely like that which must be made by a district court when it is called on to decide the merits of a claim in order to determine whether federal jurisdiction exists. *United States v. United Mine Workers of America,* 330 U.S. 258, 292 n. 57, 67 S.Ct. 677, 695 n. 57, 91 L.Ed. 884 (1947); *Davis v. Cluet, Peabody & Co.,* 667 F.2d 1371, 1374 n. 8 (11th Cir.1982); *Carter v. United States,* 135 F.2d 858, 861 (5th Cir.1943).[6] Third, if military courts should abridge Wickham's constitutional rights in the course of resolving the status of her discharge, the writ of habeas corpus is available for collateral attack on the military court judgment. Article 3(b) of the UCMJ is, on its face, a constitutional assignment of military court jurisdiction.

In closing, we also note that *Toth* speaks to one whose offense was not connected with the severance of his ties with the military. Wickham, upon obtaining her discharge, was not totally released but instead was transferred from Active Duty to a Reserve component.[7] All military ties were not severed.[8] She did not become a "full-fledged" civilian. *Wheeler v. Reynolds,* 164 F.Supp. 951, 955 (N.D.Fla.1958).[9] Since,

even if her discharge from active duty was valid, Wickham remained in a Ready Reserve duty status for the remainder of her contract enlistment period, her status would not equate with that of civilian. If it should be determined that the fraud-in-discharge issue is one that must constitutionally go to a civil court, we would nevertheless hold that Article 3(b) of the UCMJ is valid as applied to Wickham in this case since she remained a member of an armed forces reserve component.

The last issue raised by the plaintiff is that of money damages. Wickham asks this court to reverse the district court judgment and to remand this action for a trial on the damages issue. She seeks $25,000 from Colonel Hall in his official capacity and also asks for recovery "for the costs, anxiety, and inconvenience" of defending herself in this case. Because of our resolution of the constitutional claim, the damages question is moot.

The judgment of the district court is AFFIRMED.

THORNBERRY, Circuit Judge, dissenting:

Because Article 3(b) is grounded on a presumption of guilt, and constitutes an unconstitutional expansion of military jurisdiction, I must respectfully dissent from the majority's opinion in this case.

---

**6.** This circuit has applied *United Mine Workers* to the claim of a federal commission that it had jurisdiction to determine its jurisdiction. In *Pennzoil Co. v. Federal Energy Regulatory Commission,* 645 F.2d 360 (5th Cir.1981), we held that the Commission had jurisdiction under the Natural Gas Act to determine whether sufficient contractual authority existed for it to entertain a rate increase filing. *Id.* at 374 n. 26.

**7.** All persons who enlist in the armed forces are obligated to serve for six years. 10 U.S.C. § 651(a). If a serviceman is discharged from active duty before he completes his military obligation he is required to complete his tour of duty in the reserves. 10 U.S.C. § 651(b).

**8.** The military service obligation is considered terminated upon a discharge for the purpose of complete separation from military status. It is not considered terminated upon discharge or other type of separation for the purpose of immediate entry or reentry in the same or any other component of the armed

forces, or for the purpose of entry into an officers' training program in which the individual has military status. 32 C.F.R. § 50.2(d)(3) (1981).

**9.** In *Wheeler,* the serviceman had enlisted for eight years and was discharged from active duty. The Air Force required a transfer to reserve duty to fulfill the eight-year military obligation. The court stated:

Nonetheless, by reason of his military obligation and reserve status, however inactive or limited it may be, for the military purposes intended by Congress to be served by the creation and maintenance of the present reserve components of the armed forces, petitioner, when released from active duty, was not a full-fledged civilian, nor in the same status as a discharged veteran, but was an Airman Third Class of the Air Force Reserve. 164 F.Supp. at 955.

## A. *Impermissible Presumption*

The majority has concluded that Article 3(b) of the Uniform Code of Military Justice, 10 U.S.C. § 803(b) (1976), constitutionally confers court-martial jurisdiction over a former servicewoman who has received a facially valid discharge later challenged by the issuing service on the ground that it was fraudulently procured. In order to reach this result, it appears to me that the majority has implicitly indulged in the impermissible assumption that Wickham is guilty of the fraudulent act with which she is charged.

On October 15, 1980 Wickham obtained a facially valid discharge from her military obligations. The discharge resulted from a determination that Wickham was pregnant, based on the results of a urine test, and a pelvic examination by an Army doctor. The effect of this discharge was to terminate her active military service, and to return her to the civilian status she enjoyed before her term of service began.[1] As a civilian, Wickham was and is not subject to the jurisdiction of the courts-martial. *McElroy v. Guagliardo,* 361 U.S. 281, 80 S.Ct. 305, 4 L.Ed.2d 282 (1960); *Grisham v. Hagan,* 361 U.S. 278, 80 S.Ct. 310, 4 L.Ed.2d 279 (1960); *Kinsella v. Singleton,* 361 U.S. 234, 80 S.Ct. 297, 4 L.Ed.2d 268 (1960); *Reid v. Covert,* 354 U.S. 1, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); *Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955).[2]

A few weeks after Wickham returned to civilian life, information surfaced suggesting that she may have submitted, as her own, a urine specimen obtained from a

1. "It is the general rule that the person is amenable to the military jurisdiction only during the period of his service as an officer or soldier. Thus, in the case of an officer, the jurisdiction commences with the acceptance of his appointment or commission, or, where originally appointed by State authority, with his muster (or re-appointment,) into the service of the United States, and ends with his death, the acceptance of his resignation, his dismissal, &c.,—or if a volunteer officer—his discharge or mustering out, &c. *In the case of a soldier, it begins with his enlistment, or muster into the service, and ends with his discharge* or muster out. In other words, the general rule is that military persons—officers and enlisted men—are subject to the military jurisdiction, so long only as they remain such; *that when, in any of the recognized legal modes of separation from the service, they cease to be military and become civil persons, such jurisdiction can, constitutionally, no more be exercised over them than it could before they originally entered the army, or than it can over any other members of the civil community.*"

W. Winthrop, Military Law and Precedents 89 (1920) (emphasis added). In discussing the related question of the extent of military jurisdiction over a soldier who commits an offense, is discharged, and then re-enlists, Colonel Winthrop arrives at the same conclusion.

It is the opinion of the author that, in separating in any legal form from the service an officer or soldier or consenting to his separation therefrom, and remanding him to the civil status at which the military jurisdiction properly terminates, the United States, (while it may of course continue to hold him liable for a pecuniary deficit,) *must be deemed in law to waive the right to prosecute him before a court-martial for an offense previously committed but not brought to trial.* In this view, a subsequent re-appointment or re-enlistment into the army would not revive the jurisdiction for past offenses, but the same would properly be considered as finally lapsed.

*Id.* at 93 (emphasis added). Colonel Winthrop's treatise on military law is, as the majority notes, the leading authority on the area.

2. In *Ex parte Milligan,* 4 Wall. 2, 18 L.Ed. 281 (1866), a landmark decision, the Supreme Court held that military authorities were without power to try civilians, relying primarily on the fact that courts-martial dispense with the right of trial by jury guaranteed by Article 3, section 2, clause 3 of the Constitution.

The great minds of the country have differed on the correct interpretation to be given to various provisions of the Federal Constitution; and judicial decision has often been invoked to settle their true meaning; but until recently no one ever doubted that the right of trial by jury was fortified in the organic law against the power of attack. It is *now* assailed; but if ideas can be expressed in words, and language has any meaning, *this right*—one of the most valuable in a free country—is preserved to everyone accused of crime who is not attached to the Army, or Navy, or Militia in actual service.

Id. at 122–23 (emphasis in original). Similarly, in Military Law and Precedents, Colonel Winthrop discusses a class of statutes that purported to subject certain categories of civilians to military jurisdiction. These categories were defined as follows:

(1.) Officers and soldiers retained under military jurisdiction, after discharge, &c., by the last clause of the 60th article of war,

pregnant servicewoman she knew. An investigation conducted by Army agents led to the procurement of sworn statements corroborating this information. A formal charge was then lodged against Wickham, alleging that she had procured her separation from the armed forces in violation of Article 83(2) of the Uniform Code of Military Justice, 10 U.S.C. § 883(2) (1976), by falsely representing that she was pregnant. She faces up to five years confinement at hard labor, a dishonorable discharge, and the forfeiture of all pay and allowances. 10 U.S.C. § 856 (1976). This formal charge is still pending against her. She has never been tried on this charge by any court, civil or military. She is still a civilian.[3]

In order to exercise jurisdiction over Wickham a court-martial must necessarily presume that she is a servicewoman. How-

ever, she would only be a servicewoman if she is guilty of the very offense for which it wishes to try her; fraudulent separation from the service. Neither the common law, nor the military law, authorizes such a presumption of guilt. Quite the contrary. The presumption of innocence is a fundamental tenet of both systems of justice.

The majority recognizes this inconsistency in its analysis, but dismisses it by concluding that the alternative analysis creates an equally insoluble conundrum:

> To allow the military court to assert jurisdiction over the claim that her discharge was fraudulently procured so that the military court can determine whether there was fraud in its procurement presumes she is still in the service. It is just as circular, however, to presume the discharge is valid and thereby confer[4] upon

---

providing for the punishment of frauds against the United States, &c.: (2.) Officers accorded a trial by general court-martial, after being summarily dismissed, by Sec. 1230, Rev.Sts.: (3.) Soldiers sentenced to dishonorable discharge and confinement, and, after discharge, held in confinement at the Military Prison at Leavenworth, who are made liable to military trial for offences committed during confinement as being within the terms of Sec. 1361, Rev.Sts.: (4.) Discharged soldiers of the regular army who are inmates of the Soldiers' Home, and as such made subject to the rules and articles of war by Sec. 4824, Rev.Sts.: (5.) Discharged officers and soldiers of volunteers, who, as inmates of the National Home for Disabled Volunteer Soldiers, are made similarly subject by Sec. 4835, Rev.Sts.

143 GENERAL PRINCIPLE OF NON–AMENABILITY OF CIVILIANS TO THE MILITARY JURISDICTION IN TIME OF PEACE. All persons of these several classes are *civilians,* by reason of their legal discharge or dismissal from the military service. That a civilian, entitled as he is, by Art. VI of the Amendments to the Constitution, to trial by jury, cannot legally be made liable to the military law and jurisdiction, in time of peace, is a fundamental principle of our public law, and it is quite probable that Congress did not contemplate in these enactments any material departure from this principle.

144 CONSTITUTIONALITY OF THE STATUTES. These laws, however, remain on the statute book, and under Sec. 1361 discharged

soldiers have not unfrequently been brought to trial, while under Art. 60 discharged officers and soldiers are always liable to be tried.

The opinion of the author—that this class of statutes, which in terms or inferentially subject persons formerly in the army, but become finally and legally separated from it, to trial by court-martial, are all necessarily and alike unconstitutional—remains unmodified. In his judgment, *a statute cannot be framed by which a civilian can lawfully be made amenable to the military jurisdiction in time of peace.* W. Winthrop, Military Law and Precedents 104–107 (1920) (emphasis in original).

**3.** The Army itself apparently recognized Wickham was a civilian prior to bringing formal charges against her. A memorandum dated December 12, 1980 from Lt. Col. Snell to the Commander of Fort Sam Houston, contains the following notation: "The former commander of subject accused in this case did not inform her of this charge because of her present civilian status."

**4.** The majority appears to misconceive the nature of the jurisdictional problem facing us. The question is not whether the federal courts have jurisdiction of an action against Wickham for fraud. The question is, shall the military courts be allowed to encroach upon this jurisdiction?

> Under the grand design of the Constitution civilian courts are the normal repositories of

a civil court jurisdiction to decide the issue of validity.

It is not "just as circular" to presume the discharge is valid, and limit the military to its action in federal court. The argument is a simple one. A discharge "becomes effective when it is ordered by competent authority and the dischargee receives either actual or constructive notice of it." *United States v. Bonner,* 22 C.M.R. 510, 515 (1956). These conditions were met in our case. An effective discharge returns a person to civilian status. As a civilian, Wickham is not subject to court-martial jurisdiction. *United States v. Santiago,* 1 C.M.R. 365 (1951). This analysis is linear, starting from a valid, permissible presumption, and then proceeding logically to its inescapable conclusion. There is no bootstrapping here. The problem of circularity only arises when, in its effort to exercise court-martial jurisdiction over Wickham, the Army finds itself in the uncomfortable position of having to presume her guilt. There is no way out of this catch-22; the Army wishes to try her to prove her guilt, but it cannot try her unless her guilt has already been proved.

The fallacy inherent in an argument is often most clearly revealed by the illogical consequences of its application. If Wickham is tried by court-martial and then acquitted, it will mean that she was validly discharged. If she was validly discharged, then she was a civilian all along, and was not subject to military jurisdiction. Of course, if the military lacked jurisdiction to try her, of what value is the determination by a court-martial that she is innocent, and therefore a civilian? The argument circles endlessly back to its source, confounded as it is by its own impermissible premise.

power to try persons charged with crimes against the United States. And to protect persons brought before these courts, Article III and the Fifth, Sixth, and Eighth Amendments establish the right to trial by jury, to indictment by a grand jury and a number of other specific safeguards. By way of contrast the jurisdiction of military tribunals is a very limited and extraordinary jurisdiction derived from the cryptic language in Art. I,

## B. *The Three* Toth *Factors*

In *Toth v. Quarles,* 350 U.S. 11, 76 S.Ct. 1, 100 L.Ed. 8 (1955), the United States Supreme Court held unconstitutional Article 3(a), 10 U.S.C. § 803(a) (1976), the companion statute to Article 3(b). Article 3(a) subjected to court-martial jurisdiction any ex-serviceman or woman who while in the military committed an offense punishable by confinement for five years or more, for which the person could not be tried in any state or federal court. Even though Congress had not at the time of *Toth* seen fit to provide for federal district court trials of discharged soldiers accused of otherwise untriable offenses committed while in the military, the Supreme Court found Article 3(a) to be an unconstitutional extension of military jurisdiction.

In finding Article 3(a) unconstitutional, the *Toth* Court analyzed three aspects of this proposed extension of court-martial jurisdiction. The Court first asked whether this exercise of jurisdiction was justifiable in light of the military's primary function, which is to fight or be ready to fight wars.

We find nothing in the history or constitutional treatment of military tribunals which entitles them to rank along with Article III courts as adjudicators of the guilt or innocence of people charged with offenses for which they can be deprived of their life, liberty or property. Unlike courts, it is the primary business of armies and navies to fight or be ready to fight wars should the occasion arise. But trial of soldiers to maintain discipline is merely incidental to an army's primary fighting function. To the extent that those responsible for performance of this primary function are diverted from it by the necessity of trying cases, the basic fighting purpose of armies is not served.

§ 8, and, at most, was intended to be only a narrow exception to the normal and preferred method of trial in courts of law. Every extension of military jurisdiction is an encroachment on the jurisdiction of the civil courts, and, more important, acts as a deprivation of the right to jury trial and of other treasured constitutional protections.
*Reid v. Covert,* 354 U.S. at 21, 77 S.Ct. at 1232–1233.

*Toth,* 350 U.S. at 17, 76 S.Ct. at 5. How necessary is Article 3(b) to the business of fighting wars? It would appear quite incidental. This is a case of first impression. The Armed Services have gotten along nicely for more than thirty years without having to invoke Article 3(b) against former servicemen or women. *Wickham v. Hall,* 12 M.J. 145, 156 (C.M.A.1981) (Everett, C.J., dissenting). Neither the ability nor the inclination of soldiers to fraudulently procure their discharge has heretofore posed any measurable threat of "thin[ning] the ranks of those ready for combat." The specter of mass defections from the ranks through fraudulently obtained discharges is a chimera. I see no justification for expanding military jurisdiction to combat a problem that simply has not been shown to exist. As Justice Black noted in *Toth:* "It is impossible to think that the discipline of the Army is going to be disrupted, its morale impaired, or its orderly processes disturbed by giving ex-servicemen the benefit of a civilian court trial when they are actually civilians." *Toth,* 350 U.S. at 22, 76 S.Ct. at 8.

The second question asked in *Toth* was whether the extension of military jurisdiction authorized by the statute at issue actually or *potentially* swept under military jurisdiction a significant number of persons not otherwise subject to military law. The majority claims that the reach of Article 3(b) in this respect is minimal, because it only subjects to jurisdiction those who in fact fraudulently procure a discharge. This is only half the story. While article 3(b) does *actually* bring under military jurisdiction those who fraudulently procure a discharge, *Toth* also instructs us to include in our tally all those who may *potentially* come within the jurisdiction of the courts-martial under the statute. Article 3(b) sweeps under military jurisdiction all former servicemen and women holding a presumptively valid discharge against whom the military authorities may later decide to lodge a charge of fraudulent separation. It places over the head of every veteran a damoclean threat that, without a hearing, he may be seized by the military authorities to face trial by court-martial on the charge that his discharge was fraudulently procured. The potential reach of Article 3(b) is enormous.

Last, the *Toth* Court asked whether this particular extension of court-martial jurisdiction is the least possible power adequate to the end proposed. The purpose of Article 3(b) is to deter potential offenders from fraudulently procuring their discharge, and to punish those who do. As Chief Judge Everett noted in his persuasive dissent in Wickham's prior appeal, *Wickham v. Hall,* 12 M.M. 145 (C.M.A.1981) (Everett, C.J., dissenting),[5] the Army has several adequate

---

5. It should be noted that *Wickham v. Hall,* 12 M.J. 145 (C.M.A.1981), the prior opinion in this case upon which the majority relies, reveals considerable disagreement among the three judges who ruled on Wickham's petition.

Judge Cook, who wrote the opinion of the court, reached essentially the same conclusions as the majority in our case.

Judge Fletcher, who concurred in the result, felt that Wickham's petition for extraordinary relief should be dismissed because the jurisdictional question it raised presented a mixed question of law and fact, which should properly be decided by the military judge below under 10 U.S.C. § 802(1) (1976). This section of the UCMJ defines those persons subject to military jurisdiction as:

    Members of a regular component of the armed forces, including those awaiting discharge after expiration of their terms of enlistment; volunteers from the time of their muster or acceptance into the armed forces;

inductees from the time of their actual induction into the armed forces; and other persons lawfully called or ordered into, or to duty in or for training in, the armed forces, from the dates when they are required by the terms of the call or order to obey it.

10 U.S.C. § 802(1) (1976). It is apparent that Wickham does not fall into any of these categories; the only category she could come under is the first, were it not for the fact that she is no longer awaiting discharge, but has already been discharged. Had Judge Fletcher's views prevailed, the military judge could only have concluded that Wickham was not subject to court-martial jurisdiction.

Chief Judge Everett dissented from the opinion of the court, persuasively arguing that Article 3(b) was unconstitutional.

This three-way split of the United States Court of Military Appeals makes clear, as Judge Cook noted on page 153 of the opinion, that Wickham's petition for extraordinary relief

alternative remedies available to it, none of which raises the constitutional issue before us. Id. at 156. W. Winthrop Military Law and Precedents 93–94 & n. 65 (1920). Wickham may be prosecuted for fraud in federal district court under 18 U.S.C. § 287, or 18 U.S.C. § 1001. Since these charges are criminal, the Speedy Trial Act would ensure their swift adjudication. Alternatively, the Army could bring a civil suit for fraud against Wickham, seeking to prove by a mere preponderance of the evidence that her discharge was fraudulently obtained. Once the discharge was set aside, Wickham would of course be subject to court-martial jurisdiction. Should Wickham in fact be guilty of the fraudulent act with which she is charged, there is no risk that she will escape unpunished. Even if this country were to engage in another war, and the incidence of fraudulent discharges began to undermine the Army's ability to fight, suspected offenders could still be prosecuted to the limit of the law in the federal courts.

It is also clear that the ability of the Armed Services to deter such conduct is not diminished by requiring them to resort to civilian courts to prosecute offenders. Although military justice in some cases may be swifter, it is no surer than that meted out in the federal courts. I can only conclude that Article 3(b) is not the least possible power adequate to the end proposed.

In sum, Article 3(b), like Article 3(a), fails to satisfy the three *Toth* criteria which must guide us in determining the constitutionality of any statute that expands the scope of military jurisdiction, and encroaches upon the jurisdiction of the Article III courts. Article 3(b), like Article 3(a), is unquestionably unconstitutional.[6]

### C. *Reserve Obligation*

As an alternative basis for its holding, the majority proffers the argument that since Wickham was discharged into the

Ready Reserve, her status "would not equate" with that of a civilian. In *United States v. Brown,* 12 U.S.C.M.A. 693 (1962), the United States Court of Military Appeals affirmed a United States Board of Review determination that a continuing reserve obligation constituted an insufficient basis for the exercise of court-martial jurisdiction under Article 3(a). It is significant that, without deciding this issue, the majority opinion of the United States Court of Military Appeals in our own case assumed that Wickham's "obligation to perform reserve duty, even with tours of active duty, is insufficient connection with the military to make her constitutionally amenable to trial by court-martial under Article 3(b) of the Code." *Wickham,* 12 M.J. at 149. This is a reasonable assumption. If a reserve obligation is insufficient to justify the exercise of court-martial jurisdiction under Article 3(a), it cannot magically metamorphose into a sufficient basis for the exercise of military jurisdiction under Article 3(b), especially where the reasons for the unconstitutionality of both statutes are the same.

### D. *Other Considerations*

The remaining arguments advanced by the majority in support of its conclusion that Article 3(b) is constitutional are equally unpersuasive.

The power to try civilians for allegedly procuring their military discharge by fraud is easily distinguishable from the power to court-martial deserters. A deserter is, by definition, a soldier. 10 U.S.C. § 885 (1976). Unlike discharge, desertion works no change in a soldier's military status. There is no question that the military has court-martial jurisdiction over its soldiers. *Ex parte Campo,* 71 F.Supp. 543 (D.C.N.Y.), *affirmed,* 165 F.2d 213 (2d Cir.1947).

The majority's analogy to the power of a court to exercise jurisdiction to determine its own jurisdiction is misplaced. None of

to that Court was not dismissed for the reasons set forth in Judge Cook's opinion, and largely adopted by the majority in our case. The United States Court of Military Appeals, the *military* court ultimately responsible for determining the scope of *military* jurisdiction, could not agree that it had jurisdiction under Article 3(b).

6. "In light of the *Toth* case, it is clear that [Article 3(b) ] is unconstitutional insofar as it authorizes court-martial of an ex-serviceman for getting a fraudulent discharge." R. Everett, Military Justice 36 (1956).

the cases cited by the majority authorize a court to simply presume a defendant's guilt for the purpose of exercising jurisdiction over him. Cases applying the doctrine of jurisdiction to determine jurisdiction generally deal with the validity of orders issued under a court's determination that it has jurisdiction of an action, and with the ability of such a determination to withstand subsequent collateral attack. *See, e.g., United States v. United Mine Workers of America*, 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed. 884 (1947); *Davis v. Cluet, Peabody & Co.*, 667 F.2d 1371 (11th Cir.1982); *Carter v. United States*, 135 F.2d 858 (5th Cir.1943). The jurisdictional determination either that a federal question is present, or that certain facts exist supporting the exercise of federal jurisdiction, is quite different from a presumption of ultimate guilt.

The majority also claims that Wickham's argument presupposes that an unfair resolution of the issue awaits her before a court-martial, and that military courts are "Kafkaesque Star Chambers." [7] The majority evidently misapprehends Wickham's argument. All she is claiming is that since she is not a soldier, she may not be tried as a soldier. As a civilian, she is entitled like any other civilian to be tried by a court of competent jurisdiction, whose process is firmly anchored in those constitutional safeguards to which she is entitled.

Last, there is nothing particularly "military" about fraudulent misrepresentation. A quick look at the United States Code will show that this crime is, unfortunately, a familiar enough feature of civilian life. *See, e.g.,* 15 U.S.C. § 77q (1976); 18 U.S.C. §§ 1001, 1002, 1003, 2314 (1976); 42 U.S.C. § 1973i(c)–(d) (1976). The fact that the alleged fraud in this case may have led to a military discharge does not raise any peculiarly "military" question requiring the construction of Army regulations by a military tribunal. If Wickham substituted the urine specimen of a pregnant servicewoman for her own, she is guilty of fraud. If she did not, she is innocent. This is just the sort of simple fact question which a jury is uniquely competent to resolve. Under our system of law, persons charged with fraud, like those charged with other crimes, are constitutionally entitled to a trial by a jury of their peers. As Justice Black persuasively argued in *Toth:*

> [T]here is a great difference between trial by jury and trial by selected members of the military forces. It is true that military personnel because of their training and experience may be especially competent to try soldiers for infractions of military rules. Such training is no doubt particularly important where an offense charged against a soldier is purely military, such as disobedience of an

7. Justice Douglas was not alone in noting certain differences between military and civilian process. Blackstone, perhaps the greatest commentator of the 18th century, had this to say on the subject of military process:

> For martial law, which is built upon no settled principles, but is entirely arbitrary in its decisions, is, as Sir Matthew Hale observes, in truth and reality no law, but something indulged rather than allowed as law. The necessity of order and discipline in an army is the only thing which can give it countenance; and therefore it ought not to be permitted in time of peace, when the king's courts are open for all persons to receive justice according to the laws of the land.

1 W. Blackstone, Commentaries 413. Of course, this harsh judgment was made more than one hundred years ago, when military justice was considerably rougher than it is today. However, as recently as 1957, Justice Black, one of the most eminent jurists of this century, expressed the following view:

> Traditionally, military justice has been a rough form of justice emphasizing summary procedures, speedy convictions and stern penalties with a view to maintaining obedience and fighting fitness in the ranks. Because of its very nature and purpose the military must place great emphasis on discipline and efficiency. Correspondingly, there has always been less emphasis in the military on protecting the rights of the individual than in civilian society and in civilian courts.... Military law is, in many respects, harsh law which is frequently cast in very sweeping and vague terms. It emphasizes the iron hand of discipline more than it does the even scales of justice.

*Reid v. Covert,* 354 U.S. 1, 35–38, 77 S.Ct. 1222, 1240–1241, 1 L.Ed.2d 1148 (1957). *See also* L. West, They Call It Justice (1977) for a veteran military lawyer's impressions of military trials.

order, leaving post, etc. But whether right or wrong, the premise underlying the constitutional method for determining guilt or innocence in federal courts is that laymen are better than specialists to perform this task. This idea is inherent in the institution of trial by jury.

*Toth,* 350 U.S. at 17–18, 76 S.Ct. at 5–6.

I share the majority's concern that our nation continue to be defended by an effective fighting force. Our long history is replete with instances in which the effectiveness of our Armed Forces has proved crucial to the defense of our liberty. However, I do not believe that our continued security can only be bought at the price of unconstitutionally subjecting civilians to the jurisdiction of the courts-martial. For, "conceding to military personnel that high degree of honesty and sense of justice which nearly all of them undoubtedly have, it still remains true that military tribunals have not been and probably never can be constituted in such a way that they can have the same kind of qualifications that the Constitution has deemed essential to fair trials of civilians in federal courts." *Toth,* 350 U.S. at 17, 76 S.Ct. at 5. For these reasons, I must with deference dissent from the opinion of the majority in this case.