Malcolm G. SCHAEFER, Plaintiff,

v.

Thomas E. WHITE, Secretary of the Army, Defendant.

No. Civ.A. 4:01CV144–3.

United States District Court, M.D. Georgia, Columbus Division.

Nov. 14, 2001.

**2.** Plaintiff's request for the Court to appoint an attorney for him is **DENIED.**

Myles Eric Eastwood, Atlanta, GA, Gary R. Myers, Weare, NH, for Malcolm G. Schaefer, plaintiff.

Brendan F. Flanagan, Columbus, GA, for Thomas E. White, Secretary of the Army, defendant.

LAWSON, District Judge.

On October 30, 2001, Plaintiff received orders requiring him to report for active duty on November 5, 2001. On November 1, 2001, Plaintiff filed a Complaint for Declaratory and Injunctive Relief (Tab # 1) as well as a Motion for Temporary Restraining Order and Preliminary Injunction (Tab # 2), asking this Court to restrain and enjoin Defendant Secretary of the Army from enforcing the orders to active duty and further restrain and enjoin Defendant from issuing any other orders to Plaintiff by entering declaratory judgment in Plaintiff's favor that he is a civilian and not subject to any military control. The Court heard arguments by both parties on November 2, 2001 and entered an Order (Tab # 5) on November 5, 2001 which continued this matter until November 14, 2001.

## I. FINDINGS OF FACT

Plaintiff, Malcolm G. Schaefer, graduated from West Point in 1990 and served as an infantry lieutenant until 1993, when he was selected to attend the University of Virginia School of Law as an active-duty Army officer under the Funded Legal Education Program. As a result of his fully subsidized undergraduate and legal education, Plaintiff had a total Active Duty Service Obligation of eleven years.

On July 15, 1999, Plaintiff was assigned as a defense counsel to the U.S. Army Trial Defense Service[1] (TDS) in Falls Church, Virginia, with duty at Fort Benning, Georgia. (App.7.)[2]

In 1991, Plaintiff began to experience knee pain. (Schaefer Aff. ¶ 2.) Plaintiff's knees deteriorated to a point that he underwent left knee surgery in 1996 and right knee surgery in January of 1999. Plaintiff contends that by April 2000, "it became apparent to Plaintiff, his treating physicians, his treating physical therapists, that Plaintiff would probably never again be fit to run, jump, walk long distances, march with a rucksack, or conduct any other activities that included impact on Plaintiff's knees." (Compl.¶ 11.)

Plaintiff's Army physician referred him to a Medical/MSO Retention Board[3] (MMRB). (Compl.¶ 12.) Plaintiff wrote a letter to the MMRB requesting that it refer his case to a Medical Evaluation Board (MEB). (App.20.) Plaintiff also drafted and submitted a letter titled "Commander's Evaluation" signed by Captain Granville Smith, an infantry officer and the commander of A Company, 1–77th Infantry at Fort Benning, Georgia. The letter states that "Captain Schaefer's ability to perform the full range of Judge Advocate duties in a worldwide field environment is significantly impaired," and recommends a referral to the MEB. (App.21–22.)

On September 27, 2000, the MMRB recommended that Plaintiff's case be forwarded to the next step in the medical process, a MEB coupled with a Physical Evaluation Board (PEB). (App.31–34.)

Plaintiff contends that on December 28, 2000, he returned to his treating Army physician and the physician initiated a MEB, (Aff.¶ 9) while Defendant contends that the Army began conducting a MEB/PEB in March, 2001. (Def.'s Opp'n. to Pl.'s Mot. For T.R.O. and Prelim.Inj. at 4.) Plaintiff submitted a memorandum, again drafted by him and signed by Captain Smith, attesting to Plaintiff's medical condition and that "his abilities to perform the full range of Judge Advocate duties in a worldwide field environment is significantly impaired." (App.37–38.)

On June 5, 2001, Plaintiff was notified that the MEB had referred his case to the PEB at Fort Sam Houston, Texas. (App.43–44.) On or about June 11, 2001, the PEB found Plaintiff "unfit for duty" and recommended that he be medically

---

1. TDS is an activity of the U.S. Army Legal Services Agency (USALSA). All TDS counsel are assigned to USALSA with duty at specified installations. Army Regulation 27–10, ¶ 6–3.

2. All citations to "App." refer to the Appendix attached to Defendant's Opposition to Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

3. "The MMRB is an administrative screening board charged with the responsibility of comprehensively evaluating a soldier's ability or inability to physically perform PMOS [Primary Military Occupational Specialty] or specialty code tasks in a worldwide field environment. On completion of the evaluation, the MMRB will recommend to the convening authority—(1) A soldier's retainability in PMOS or specialty code. (2) The requirement to be reclassified. (3) Probationary status. (4) Referral to the Army's physical disability system." Army Regulation 600–60, § 2.1.e.

separated from the Army, with severance pay if otherwise qualified. (App.50.) Plaintiff was notified of this determination on June 13, 2001; he concurred with the findings and recommendations of the PEB. (App.50–51, 53.)

The PEB results were then forwarded to the U.S. Army Physical Disability Agency (USAPDA) in Washington, D.C. The Government contends that based on the unopposed decision, the USAPDA issued orders (Orders No. 183–2200) on the authority of U.S. Army Personnel Command (PERSCOM) on July 2, 1001, separating Plaintiff from the Army for medical disability with an effective separation date of September 14, 2001. (App.54–55.) Plaintiff contends that USAPDA forwarded his case to PERSCOM and PERSCOM directed Plaintiff's discharge. Plaintiff contends PERSCOM is the issuing authority for such orders.[4] (Compl.¶ 17.)

During this entire time, Plaintiff did not inform anyone in his supervisory chain of command that he was undergoing a medical board. (App.62.) The few people in the military who knew about Plaintiff's medical condition were asked by the Plaintiff to keep quiet.[5]

None of the correspondence from the MMRB, the MEB, or the PEB went to Plaintiff's commander at USALSA in Virginia or to anyone in his JAG Corps supervisory chain.[6] (Def.'s Opp'n. to Pl.'s Mot. For T.R.O. and Prelim.Inj. at 5.)

On July 31, 2001, Mr. Bruce Fresh with the JAG Corps' personnel office discovered Plaintiff's pending discharge while updating their database from PERSCOM. (App.56–60.) Fresh telephoned Dennis Brower, Agency Legal Advisor, USAPDA, who reviewed the case file. Brower stated that he immediately noticed the absence of performance statements from any JAG Corps supervisors[7] and that the MMRB that had referred the case to the disability review had not been properly constituted. Brower requested Plaintiff's most recent evaluation reports and asked Colonel Tate whether the JAG Corps wished to provide input as to whether Plaintiff could continue to perform his duties as a member of the JAG Corps. Tate prepared a memorandum to the Commander, USAPDA, dated August 10, 2001, on behalf of the Judge Advocate General, stating that he "reviewed the medical facts and physicians' opinions ... and conclude with certainty that Captain Schaefer can effectively perform his assigned duties as a judge advocate." (Compl.Ex.G.) All the information Brower gathered indicated that Plaintiff could perform his JAG Corps duties. On August 10, 2001, Brower faxed this infor-

---

4. Plaintiff stresses this distinction because Army Regulation 600–8–105, § 2–21.a provides that "Only the organization that published the original order may amend, rescind, or revoke the order."

5. In June 2001, Plaintiff asked Captain Smith to "keep his medical situation confidential" and explained that revealing his plans to the Staff Judge Advocate would hinder his ability to perform his duties. (App.23.) Upon being counseled on his Informal PEB Findings by Deborah Koons, Plaintiff asked her to "keep all of this quiet ... if his superiors found out they would be after him, to try and cancel the board and retain him on active duty." (App.52.) When Captain Thompson gave

Plaintiff a telephone message about "medical results," Plaintiff instructed Thompson "not to tell anyone else about what I knew." (App.97.)

6. Small JAG units such as the Plaintiff's resulted in a dual chain of command. Thus, Plaintiff had an administrative commander and a technical commander. The JAG chain of command is called the "technical" chain. (Tate Dep. at 19.)

7. Army Regulation 600–60, ¶ 3–2(e) requires that a member of the JAG Corps, senior in grade to Plaintiff, be a voting member of the MMRB.

mation to the Fort Houston, Texas PEB and asked if based upon this new information, whether they wished that the case be formally returned for reconsideration.[8] Brower briefed Colonel Bell of USAPDA; Bell concurred with Brower that regardless of whether the PEB wanted the case back, the case had to be held and the separation authorization revoked. Brower requested Mrs. Irene Baker of USAPDA processing to have the authorization for Plaintiff's separation orders revoked. Brower stated that there were some initial problems with the TRANSPROC system[9] accepting the revocation, but he was informed that the revocation was ultimately successful and the TRANSPROC system indicated that the revocation was accepted and effective on August 14, 2001.[10]

On August 13, 2001, PEB responded that they did want to reconsider Plaintiff's case and on August 20, 2001, the case was officially returned to the Texas PEB for reconsideration. Prior to receiving the results of the reconsideration, Plaintiff had been informed of the likely outcome. Plaintiff had called Mr. Dennis Brower three times during the first two weeks in August to discuss his case. Brower informed him that it appeared that his case would be changed to "fit," and that his case was being "held" until a final decision had been made. (App.57.) On August 6, 2001, Plaintiff called Major Mike Mulligan of the JAG Corps; Mulligan told Plaintiff that the Physical Evaluation Review Board Agency's final decision would likely be that he was fit for duty. (App.64–67.) Plaintiff told a subordinate of his, Captain Eva Clements, that he "would not be leaving the Army" and that he would be going to the Judge Advocate Graduate Course next year. (App.92–93.) Plaintiff told his supervisor, Lieutenant Colonel Peter Zolper, that his disability board results had been "voided" and that he would attend the 2002 JAG Graduate Course next year, while expressing a desire to continue his duties as the Senior Defense Counsel at Fort Benning. (App.94–96.)

On September 5, 2001, the PEB reconsidered the case and found Plaintiff fit for duty. This finding was placed on DA Form 199 and served on the soldier on September 5 by Physical Evaluation Board Liaison Officer (PEBLO) Kathryn Sneddon in Fort Benning, Georgia. Ms. Sneddon counseled Plaintiff on the findings. Plaintiff told her that he had orders and was in the process of clearing. He asked her what he should do; she replied that his case was being put on hold and that since he had been found "fit" his only two options were to either Concur or Nonconcur by submitting a written appeal. (App.88.) Sneddon advised Plaintiff that he had ten days to return with his written appeal. He signed the election form for the Reconsideration of DA Form 199 indicating his nonconcurrence, and he agreed to return by September 17, 2001 with his written appeal. (App.83, 85.)

---

**8.** Plaintiff contends USAPDA had no authority to refer his case back to PEB for reconsideration because the case already had a "final decision" entered on it by PERSCOM. Plaintiff contends the only exception would have been a request by PDA to PERSCOM to cancel the discharge instructions pursuant to § E–9.e of Appendix E to Army Regulation 635–40. (Compl.¶ 21.)

**9.** The system which inputs and disseminates orders for Army soldiers is called TRAN-

SPROC. (App.83.) It is an Intranet to connect various Army installations regarding the status of soldiers' assignments, promotions, and separations. (App.83.)

**10.** Baker contacted Fort Benning's transition center and spoke with Coraritta Nixon. (App.75, 116.) Baker verbally informed Nixon that Plaintiff's discharge orders had been revoked. Nixon made a note of the revocation and told her lead clerk Mayra Hernandez. (App.116.)

On September 10, 2001, Plaintiff was actively out-processing from Fort Benning. (App.101) The next day, September 11, 2001, Plaintiff told Captain Thomas Thompson that the JAG Corps had stopped his medical board and that he was staying at Fort Benning. (App.97–98) Thompson testified at the hearing on November 2, 2001 that if Plaintiff had told him that he was leaving on September 15, 2001 he would have had a duty to report that to his chain of command. Thompson testified that he believes that Plaintiff "would have known that I have a duty to report that to my chain of command, and they may have had something to say about him leaving in four days." (Hr'g. Tr. at 77.) Despite Plaintiff's assurances to Thompson, Plaintiff continued to out-process through the week of September 10. (App.99–103.) On September 13, 2001, Plaintiff called the transition separation point to confirm that they would be open the next day. (App.116.)

On September 14, 2001, Plaintiff appeared at the Fort Benning transition point to sign the paperwork for his discharge. Despite the verbal orders previously given, the personnel forgot about the verbal revocation and nothing in the TRANSPROC system indicated that Plaintiff's orders had been revoked. (App.116.) The transition point gave Plaintiff a DD Form 214 discharge certificate[11] and authorized him $97,013.40 in disability severance pay. (App.109, 118–121.) The discharge certificate was handed to Plaintiff and he left Fort Benning that day.

The JAG Corps learned of Plaintiff's departure on September 17, 2001 when Sergeant Holmes entered Plaintiff's office and found it cleaned out. (App.111–12.)

On September 18, 2001, Lieutenant Colonel Kilgallin informed Brower that Plaintiff had left the service on September 14, 2001. Brower informed Kilgallin that "as far as this Agency [USAPDA] was concerned the DA authorization for his separation had been revoked on 14 Aug 01, and the Fort Benning Transition Point had no authority to separate him." (App.57.) USAPDA instructed the Fort Benning Transition Point to revoke the separation orders as being null and void. They indicated to USAPDA that they did so and informed Plaintiff of this revocation on September 18, 2001.

On September 20, 2001, Plaintiff's commander, Brigadier General Daniel Wright of USALSA, initiated a commander's inquiry pursuant to Rule for Court–Martial (R.C.M.) 303. Lieutenant Colonel Gregory Coe was appointed to conduct the inquiry. Coe interviewed numerous witnesses and attempted to question Plaintiff through his counsel, but Plaintiff failed to respond.[12] On October 11, 2001, Coe completed his inquiry, finding probable cause that Plaintiff had committed a violation of Article 83 UCMJ (10 U.S.C. § 883) for obtaining a fraudulent separation and recommended

---

11. The DD Form 214 states "disability" as the reason for the discharge. In addition, the form appears conditional on its face. The form states: "Data herein subject to computer matching within DOD or with other agencies for verification purposes and determining eligibility or compliance for federal benefits."

12. Plaintiff failed to cooperate with the Government in regards to this Motion as well. Plaintiff refused to answer any substantive questions during his deposition. He refused to verify the truthfulness of his complaint or his affidavit, which he had submitted to this Court in support of his motion for injunctive relief. He refused to answer questions that would have shed light on whether he fraudulently obtained his discharge (Schaefer Dep. at 13), whether his discharge was void as a matter of law, and whether the orders granting the discharge had been properly revoked. *Id.* at 35–37.

that a court-martial charge should be preferred against Plaintiff. (App.8–15.)

Coe also recommended that Plaintiff be notified that he must return to his duty station. If Plaintiff did not voluntarily return, Coe recommended that "the command should prefer a charge against Major Schaefer for a violation of Article 83, UCMJ (Fraudulent Separation)." (App.10.)

On October 29, 2001, the Commander of USALSA issued letter orders requiring Plaintiff to return to duty at Fort Benning's Office of the Staff Judge Advocate on November 5, 2001. (App.3.) The order states, "This command conducted an inquiry into your departure from duties as the Senior Defense Counsel at Fort Benning. Based on that inquiry, we have concluded that you obtained a invalid separation and discharge and have not been released from active duty." On November 1, 2001, Colonel John Phelps preferred a court-martial charge against Plaintiff for obtaining a fraudulent discharge in violation of Article 83, UCMJ. (App.1–2.) Also on November 1, 2001, Plaintiff filed suit in this Court. In his Motion for Temporary Restraining Order and Preliminary Injunction (Tab # 2), Plaintiff asks this Court to restrain and enjoin Defendant Secretary of the Army from enforcing the orders to active duty and further retain and enjoin Defendant from issuing any other orders to Plaintiff by entering declaratory judgment in Plaintiff's favor that he is a civilian and not subject to any military control.

Plaintiff contends he received an Honorable Discharge from the Army and is now a civilian. He argues his Discharge Orders No. 183–2200 were never rescinded prior to September 14, 2001 since, according to Plaintiff, only PERSCOM, as the issuing authority, could have cancelled the Discharge Orders. (Compl.¶ 7.) Plaintiff's Complaint states that the Army has taken "de facto action to rescind Plaintiff's dis-

charge after-the-fact. The Army's assertion of jurisdiction over Plaintiff, a civilian, violates the Constitution and Laws of the United States of America." (Compl.¶ 9.) Meanwhile, Defendant contends Plaintiff obtained an invalid separation and discharge and has not been released from active duty.

## II. CONCLUSIONS OF LAW

■ To obtain a temporary restraining order and preliminary injunction a plaintiff must show:

(1.) A substantial likelihood of succeeding on the merits;

(2.) A substantial threat of irreparable injury if relief is denied;

(3.) An injury that outweighs the opponent's potential injury if relief is granted; and

(4.) An injunction would not harm the public interest.

*Gold Coast Publications, Inc. v. Corrigan,* 42 F.3d 1336, 1343 (11th Cir.1994).

Plaintiff refers the Court to numerous opinions which hold that once a plaintiff obtains a valid discharge the Army could not subject that plaintiff to a court-martial. *See Allen v. Steele,* 759 F.2d 1469 (9th Cir.1985); *Machado v. Commanding Officer,* 860 F.2d 542 (2nd Cir.1988); *Smith v. Vanderbush,* 47 M.J. 56 (1997). However, these cases are distinguishable since in these cases the Army did not question the validity of the discharge or allege that the plaintiff fraudulently secured the discharge.

Plaintiff left Fort Benning on September 14, 2001 after being issued a DD–214, "Certificate of Release or Discharge from Active Duty." (Schaefer Aff. ¶ 19.) Defendant contends (1) that this discharge was not valid because the discharge orders were revoked prior to execution, and alternatively that the discharge was based on a

medical disability that was incorrectly determined and subsequently rescinded and that Plaintiff was aware of the incorrect determination and recission, and (2) regardless of the validity of the discharge, Plaintiff procured the discharge by fraud. Findings as to the validity of the discharge as well as to whether Plaintiff fraudulently secured his discharge will determine whether or not the Plaintiff is a civilian or still in the service.

## A. Validity of the Discharge

The Army contends that Plaintiff's discharge orders were properly revoked prior to September 14, 2001. In *United States v. Williams*, 53 M.J. 316 (U.S. Armed Forces 2000), a service member's disability discharge was placed on "legal hold" hours before the effective date of his discharge even though his discharge certificate had been mailed to him. Further, he was notified of the recission after the discharge's effective date. He was directed to proceed back to his unit, which he did voluntarily. *Id.* The U.S. Court of Appeals for the Armed Forces found that the discharge had been properly rescinded prior to execution and that the military had in personam jurisdiction even though it did not notify the service member of the recission

until after the effective date and after he had already received a facially valid certificate of discharge. In attempting to distinguish this case, the Plaintiff points out that the service member voluntarily returned to the Base. However, the Court does not believe that this factor was determinative in the court's decision. This Court believes that the finding that the military had in personam jurisdiction was based on the fact that the discharge was properly rescinded.

Both parties have presented evidence on the issue of the validity of the discharge. The Government contends the discharge was revoked. The Government claims the revocation was entered into the TRANSPROC system and verbally communicated [13] to the transition separation point at Fort Benning. Plaintiff contends that the revocation did not come from the proper authority. Plaintiff claims only PERSCOM, as the issuer of the July 2 orders, had authority to revoke them.[14] Plaintiff also contends that the referral of his case to a second PEB was invalid. Plaintiff contends that PERSCOM's issuance of discharge orders on July 2, 2001 was a "final disposition" under § 4–24.b of Army Regulation 635–40, and the referral of Plaintiff's

---

13. The Court questions the sufficiency of verbal orders after reviewing transition point employee Nixon's statement to PERSCOM officials that she would need a hard copy of any orders recalling or cancelling Plaintiff's discharge orders before she could effectuate such cancellation. (App.116.)

14. Based on a review of the parties arguments and the exhibits submitted to the Court, the Court is unclear as to the relationship between PERSCOM and USAPDA. Defendant referred to PERSCOM and USAPDA interchangeably in its description of the revocation of Plaintiff's orders: "on August 14, 2001, USAPDA revoked Captain Schaefer's discharge orders" (Def.'s Opp. to Pl.'s Mot. for T.R.O and Prelim.Inj. at 6) and "when PERSCOM carried out the revocation."

(Def.'s Opp. to Pl.'s Mot. for T.R.O. and Prelim.Inj. at 7.) Plaintiff's first Memorandum to this Court stated that USAPDA forwarded Plaintiff's case to PERSCOM. (Pl.'s Mem. of Law in Supp. of Mot. for T.R.O. and Prelim.Inj. at 7.) However, Plaintiff submitted further evidence of the relationship between USAPDA and PERSCOM through Colonel Bell's testimony. Bell testified that USAPDA and PERSCOM were separate entities until the 1980s, but now the functions of PERSCOM that are in Regulation 635–40 have been subsumed by USAPDA. (Bell Dep. at 25–27.) Upon being asked to explain AR 635–40, § E–9e which provides, "USAPDA may request PERSCOM cancel discharge instructions, or amend or revoke retirement orders," Bell testified that there is a problem with the regulation. (Bell Dep. at 25.)

case to a second PEB after July 2, 2001 was not in accordance with the still effective and unchanged regulation. Thus, Plaintiff contends the second PEB was invalid as being contrary to Regulation [15] and that "courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself." *Sierra Club v. Martin,* 168 F.3d 1, 4 (11th Cir.1999), *quoting Simmons v. Block,* 782 F.2d 1545, 1550 (11th Cir.1986).

### B. Army's Charge of Fraudulently Obtaining A Discharge

The Army's charge of fraudulently obtaining a discharge results in the person discharged being subject to trial by court-martial on that charge. Title 10, U.S.C.A. § 803(b) (Article 3(b) of the UCMJ) provides:

> Each person discharged from the armed forces who is later charged with having fraudulently obtained his discharge is, subject to section 843 of this title (article 43) [statute of limitations], subject to trial by court-martial on that charge and is after apprehension subject to this chapter while in the custody of the armed forces for that trial. Upon conviction of that charge he is subject to trial by court-martial for all offenses under this chapter committed before the fraudulent discharge.

The legislative history of this provision indicates that Congress considered a person who fraudulently secured his discharge to be a member of the armed forces. *See United States v. Cole,* 24 M.J. 18, 20 (CMA 1987). The Army has taken this position as well; it contends that Plaintiff is still in the army.

Article 3(b) permits court-martial of a discharged person who is charged with fraudulently securing his discharge and Plaintiff is charged with that offense. The Army has presented evidence that Plaintiff fraudulently secured his discharge by the means by which he was found "unfit," as well as evidence of Plaintiff's actions between June 2 and September 14 that may have resulted in others not inquiring into whether his discharge had been revoked. When Plaintiff went before the MMRB and MEB he submitted a letter from Captain Smith but no letter from anyone in TDS. Upon being told that PEB had reconsidered his case and found him fit for duty, Plaintiff knew that his discharge papers were based on the finding that he was unfit; he asked what he should do about his Orders and was told that they were on hold and his only recourse would be to submit a written appeal. However, Plaintiff out-processed and became separated, knowing that the reason for which the Orders had been issued had been overturned. Plaintiff told his supervisor, Lieutenant Colonel Peter Zolper that his disability board results had been "voided" and that he would attend the 2002 JAG Graduate Course next year. (App.94–96.)

Plaintiff argues that Article 3(b) is unconstitutional on its face and as applied to himself. Plaintiff effectively traces the United States Supreme Court's treatment of court-martial jurisdiction. (Pl.'s Reply Br. in Supp. of Mot. for Prelim.Inj. at 5–19.) However, with the exception of *Wickham v. Hall,* 706 F.2d 713 (5th Cir.1983), the Plaintiff's argument does not address situations in which the Army asserted jurisdiction to try the "former" service member for the exact act that made him a

---

**15.** However, the Court believes that this reasoning also requires finding that the first MMRB was void since Army Regulation 600–60, ¶ 3–2(e) requires that a member of the JAG Corps, senior in grade to Plaintiff, be a voting member of the MMRB. Thus, the finding of "fit" seems to be voided for the same reasons that the Plaintiff argues should be applied to void the reconsidered finding of "unfit."

former service member: the discharge. This Court is not persuaded by the Plaintiff's argument that Article 3(b) is unconstitutional. Instead, the Court chooses to follow *United States v. Cole*, 24 M.J. 18, 22 (CMA 1987), in which the court sustained the constitutionality of Article 3(b) to try and punish a person who has obtained a fraudulent discharge "for his role in the procurement of this fraudulent separation." *See also United States v. Reid*, 46 M.J. 236, 238 (U.S. Armed Forces 1997).

In *Wickham*, the U.S. Court of Appeals for the Fifth Circuit affirmed the district court's grant of summary judgment in favor of the Army when an enlisted soldier attempted to enjoin the Army from prosecuting her at a court-martial for obtaining a fraudulent separation. 706 F.2d at 714. A female soldier submitted a urine sample from another pregnant soldier as though it were her own. The Army discharged Wickham from active duty on the basis of pregnancy. A few months later Army officials learned that she was not pregnant and that she had knowingly submitted the urine of another pregnant servicewoman. *Id.* The Army revoked the order which discharged her from active duty and commenced court-martial proceedings against her for fraudulently obtaining a discharge. *Id.* at 715. In holding that Article 3(b) gave the Army jurisdiction to try Wickham, the court found it was a constitutionally reasonable exercise of congressional authority. *Id.* at 716. Once a "civilian becomes a soldier, his status as a member of the armed forces can only be honorably terminated by a completion of the service obligation, or a valid discharge. A soldier may not by fraud cut short his military status before his service obligation is complete." *Id.* at 716–17.

Plaintiff attempts to distinguish *Wickham* by pointing out that Wickham was still in the Reserves at the time she was charged and therefore not a "full fledged civilian." *Id.* at 718. The Court declines to adopt Plaintiff's argument. Though the court in *Wickham* did point out this Reserve status, the Court does not believe the only reason Article 3(b) applied was because Wickham still had a Reserve commitment.

### C. Comity

This Court must decide which forum should adjudicate the Plaintiff's claim. Plaintiff contends that if the Court finds that the second PEB was improperly constituted and that the cancellation of Plaintiff's discharge orders was without regulatory authority and thus void, the Court does not need to address the constitutional validity of Article 3(b). (Pl.'s Supp.Br. in Supp. of Mot. For Prelim.Inj. at 1.) Defendant contends that even if the Court finds that Plaintiff's discharge was not properly revoked prior to execution, Article 3(b) confers personal jurisdiction over plaintiff because he is charged with obtaining a fraudulent discharge. (Def.'s Opp. to Pl.'s Mot. for T.R.O. and Prelim.Inj. at 14.)

As discussed in Section B of this Order, the Court does not find Article 3(b) unconstitutional. Because of this finding, the Court acknowledges that Article 3(b) gives the military courts jurisdiction to try the Plaintiff for this charge.

Plaintiff has requested that this Court declare that he is a civilian. Plaintiff argues that it is the duty of this Court to decide Plaintiff's status as civilian or serviceman; the Government asks the Court to permit this issue to be tried in military courts.

The Supreme Court's view in *Parisi v. Davidson*, 405 U.S. 34, 92 S.Ct. 815, 31 L.Ed.2d 17 (1972), and in *Schlesinger v. Councilman*, 420 U.S. 738, 95 S.Ct. 1300, 43 L.Ed.2d 591 (1975), supports the Government's request. As the Court stated in *Schlesinger*, "We hold that when a serviceman charged with crimes by military au-

thorities can show no harm other than that attendant to resolution of his case in the military court system, the federal district courts must refrain from intervention, by way of injunction or otherwise." 95 S.Ct. at 1313.

██ In his argument that this Court should decide his status, Plaintiff emphasizes the differences between military courts and Article III courts. Despite these differences, this Court finds that Plaintiff's claim may and should be addressed by a military court. Military courts assume the same responsibility to protect a person's constitutional rights as federal courts. *See Cole*, 24 M.J. at 20, *Wickham*, 706 F.2d at 717–18.

Further, in *United States ex rel. Toth v. Quarles*, 350 U.S. 11, 76 S.Ct. 1, 5, 100 L.Ed. 8 (1955), the Court acknowledged "that military personnel because of their training and experience may be especially competent to try soldiers for infractions of military rules." Both parties have presented arguments reflecting their interpretation and applicability of Army Regulations as well as the structure of different Agencies within the Army—such as the relationship between USAPDA and PERS-COM. Based on a review of the arguments presented, this Court believes that a military tribunal is the best forum for these issues to be addressed. Thus, the Court adopts the Government's view, which is also the Supreme Court's view in *Schlesinger*: deferring judicial review al-

lows a specially competent agency to develop the facts, apply the law in which they are peculiarly expert, and to correct their own errors. 95 S.Ct. at 1312.

The Court notes that the Plaintiff is not without recourse in federal court. Following a military court's determination, Plaintiff is entitled to seek habeas corpus relief in this Court for collateral attack on the military judgment.

### III. CONCLUSION

Plaintiff's request for this Court to restrain and enjoin the Secretary of the Army from enforcing the orders to active duty and further restrain and enjoin Defendant from issuing any other orders to Plaintiff by entering declaratory judgment in Plaintiff's favor that he is a civilian and not subject to any military control is denied. The legislative history of Article 3(b) as well as the way it has been applied by Federal Civil Courts and Military Courts indicate that if the Army charges Plaintiff with fraudulently obtaining his discharge then the Plaintiff will be subject to military control. The Court declines to follow Plaintiff's request to find Article 3(b) unconstitutional and will not declare Plaintiff to be immune from its reach. Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Tab # 2) is **DENIED.**